IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.

**DEBORAH K. FRANK**,

Plaintiff

v.

**AMFIRST BANK, NATIONAL ASSOCIATION**, a Nebraska corporation

Defendant.

## COMPLAINT

Plaintiff Deborah Frank ("Frank" or "Plaintiff") submits the following:

### NATURE OF ACTION

Plaintiff brings this action for damages as a result of Defendant's discrimination against her on the basis of sex, and as a result of its retaliation against her in violation of Title VII, 42 U.S.C. § 2000e.

### PARTIES

1. Plaintiff is a female citizen of the State of Colorado and a member of a protected class of individuals recognized under 42 U.S.C. §2000e-2(a)(1), which prohibits gender discrimination, *inter alia*.

2. Defendant is a Nebraska corporation doing business in Colorado.  It is an "employer" as defined in Title VII, 42 U.S.C. §2000e *et seq*.

3. Plaintiff was employed by Defendant during all relevant time periods.

JURISDICTION

4. Jurisdiction is invoked pursuant to 28 U.S.C §§451, 1331, 1337 and 1343.   This action is authorized and instituted by §§703, 704 and 706(f)(3) of Title VII, 42 U.S.C. §§2000e-2, 2000e-3 and 2000e-5(f)(3).

ADMINISTRATIVE PROCEDURES

5. Plaintiff has timely and properly exhausted her administrative remedies by filing an initial Charge with the Equal Employment Opportunity Commission (EEOC) on May 24, 2011, based upon grounds of gender discrimination and retaliation.

6. This lawsuit is timely filed within 90 days after Plaintiff's receipt of a Notice of Right to Sue from the EEOC, dated June 28, 2013.

FACTUAL ALLEGATIONS

7. Plaintiff incorporates by reference the allegations set forth above.

8. Plaintiff began work with Defendant in April 21, 2008.  Plaintiff's last position was as a Loan Assistant.

9. At all relevant times the Senior Vice President was Bob Callis ("Callis"). Marena Costello ("Costello") was the Vice President of Loan Administration. Kerry Wong ("Wong") was the Vice President of Operations and Mary Drey ("Drey") was the Vice President of Human Resources.

10. Callis told Plaintiff that he always carries a gun with him in the workplace. Callis also told Plaintiff that he has lots of guns and he "knows how to use them."

11. Wong also had a gun in the workplace and personally showed the weapon to Plaintiff. Plaintiff was upset.

12. Defendant's policy on "Anti-Violence" states "Weapons are not permitted in bank buildings except for armed security guards (hired armored car personnel, hired security guards or police

officers). There is no exception to this prohibition of weapons in bank buildings for other individuals who may be licensed to carry a concealed weapon."

13. On or around August 1, 2008, a gentleman began working at AmFirst. His wife came to the building one day. After she left Callis asked Plaintiff if she noticed that the wife had "cankles." Callis then told Plaintiff that a "woman with cankles is not any good in bed."

14. In October 2008, Callis made it a point to join Plaintiff in the break room during her lunch break. Callis told Plaintiff that in all the time he knew Plaintiff he never noticed how attractive she was and how soft and smooth her facial skin looked. Later that day Plaintiff told Wong what Callis had said. Wong put her head in her hands and said "Not again."

15. In October 2008, Callis asked Plaintiff if she had ever been molested or raped. Callis further told Plaintiff that he couldn't believe how many women he had worked with had been molested.

16. Between October 2008 and December 2008 Callis told Plaintiff that he thought her husband was sleeping with Callis' wife. When Plaintiff told him that was not true Callis told Plaintiff that Callis' wife was still attractive so why wouldn't Plaintiff's husband want to have an affair with her.

17. Near the end of 2008, Callis informed Plaintiff that, at a previous job, a woman he supervised became upset. Callis felt the need to hug the woman and then told Plaintiff that this led to Callis and the woman having a sexual encounter.

18. In June 2009, Callis began "confiding" in Plaintiff about Callis' relationship with a woman. Callis told Plaintiff that the woman was "really hot." Callis also told Plaintiff that she was sixty-five years old, had great looks and the body of a twenty-eight year old.

19. In October 2009, Callis began asking Plaintiff questions about Plaintiff's personal sex life. Callis asked Plaintiff if Plaintiff or her husband had ever had an affair. Callis then told Plaintiff that he

had prostrate problems and had not had sex with his wife for six years. Callis told Plaintiff that it was difficult for him to become aroused enough to get an erection but, if he was given enough time, he could "make it work."

20. In December 2009, Callis asked Plaintiff if Plaintiff had ever had an affair.

21. In January 2010, Callis told Plaintiff that Callis knew that Plaintiff's husband had had an affair over twenty years ago.

22. Around February 2010, Callis brought up his prostrate problems again with Plaintiff.

23. The following day Callis asked Plaintiff about when and where Plaintiff used a vibrator. Callis told Plaintiff that he awoke at 2:00 a.m. wondering how Plaintiff used her vibrator. He also asked Plaintiff further questions about the vibrator.

24. In March 2010, Callis gave Plaintiff a $150 gift card to Dillard's. Callis told Plaintiff that she needed more "color" in her wardrobe.

25. Around March 2010, Callis asked Plaintiff why she never wore skirts or dresses. Callis asked if plaintiff would "just for him" wear a dress or skirt. Plaintiff immediately complained to Wong.

26. Around April and May 2010, Callis told Plaintiff that he knew someone who had pictures of women "screwing" dogs in different positions.

27. Around April and May 2010, Callis asked Plaintiff about high heels. Callis said that he believed that the only reason women should wear high heels is to show off their legs because men wanted to look at their legs.

28. Around the same time Callis asked Plaintiff if she knew what the term "MILF" meant. When plaintiff said no Callis said "it's pretty bad." Callis told Plaintiff it means "Mothers I'd like to f***." Plaintiff walked away.

29. In June 2010, while Callis and Plaintiff were closing the office, Callis asked Plaintiff her bra size.

30. On or around September 15, 2010, Plaintiff received an e-mail from Callis stating that Plaintiff was no longer allowed to eat at the table in front of Wong's office. Plaintiff was required to eat in the kitchen which was in the back and was private. Plaintiff complained to Wong because Plaintiff did not want to be placed in a position where she would be alone with Callis.

31. Around September 2010, Plaintiff was in the kitchen when another male employee came in and asked to eat lunch with Plaintiff. He was afraid he would get in trouble with Callis if he sat near Plaintiff.

32. On or around October 11, 2010, Plaintiff filed a sexual harassment complaint against Callis.

33. On October 13, 2010, Plaintiff told Drey that she was unable to return to work due to a "threatening situation" involving Callis.

34. Also on October 13, 2010, Plaintiff, at the request of Drey, sent her company issued office keys to Wong while Plaintiff's complaint was being investigated.

35. On October 14, 2010, Plaintiff e-mailed her complaint of sexual harassment to President Mark Korell and Vice President of HR, Mary Drey.

36. On October 14, 2010, Drey told Plaintiff that Plaintiff had resigned her position.

37. On October 19, 2010, Plaintiff told Drey that Plaintiff had not resigned. Plaintiff told Drey that Plaintiff was terrified of Callis. Plaintiff also told Drey that Plaintiff would fully cooperate in investigating Plaintiff's complaint against Callis.

38. On October 20, 2010, Plaintiff was told that Mountain States Employer's Council, Inc. would be investigating Plaintiff's complaint.

39. On October 26, 2010, less than one week later, Plaintiff's job duties were changed and her workload increased. She had receptionist duties and was told she was a full time loan assistant. Plaintiff was also given a new supervisor, Marena Butler Costello.

40. Around October 2010, Costello told Plaintiff that she was expected to immediately respond to any of Callis' requests.

41. On November 8, 2010, Callis was formally disciplined. Callis was given a documented verbal warning for his actions against Plaintiff.

42. On November 8, 2010, President Mark Korell told Callis that "The investigation concluded that it is more likely than not that you shared information of a personal and intimate level with Ms. Frank, including statements of a sexual nature as presented to you in the course of your investigation interview."

43. On or around November 9, 2010, Plaintiff was told by Drey that Callis was never to speak to Plaintiff again.

44. On or around November 9, 2010, a file folder was created by Defendant in order to pass work documents between Plaintiff and Callis. Wong was in charge of the file.

45. On or around January 6, 2011, Costello e-mailed Plaintiff about Plaintiff's "new job responsibilities."

46. On March 1, 2011, Plaintiff e-mailed Costello and told Costello that she had not received training. Plaintiff asked Costello for help.

47. On or around March 18, 2011, Plaintiff received a very low performance appraisal. Appraisals were usually given at the end of the year.

48. On March 21, 2011, Plaintiff was constructively discharged.

49. Defendant's "Harassment Prevention" policy states" Any individual who is subject to verbally abusive language relating to sex, race, religion, or age or who experiences sexually oriented physical touching is expected to report it immediately to the Human Resources Department, president, Senior Vice President or Cashier or to the manager with whom the employee is most

comfortable. Any individual who is aware of such verbally, physically, or visually abusive, hostile, or offensive conditions, as described in this section, should report such activity immediately."

50. The Defendant's "Harassment Prevention" policy further states, "Complaints, reports, and grievances will be immediately investigated."

### FIRST CLAIM

#### (Gender Discrimination 42 U.S.C 2000e-2(a))

51. Plaintiff incorporates by reference the allegations set forth above in Paragraphs 1 through 49.

52. Defendant is an employer as that term is defined under Title VII.

53. Plaintiff is a female and belongs to a protected class.

54. Defendant willfully and intentionally subjected Plaintiff to gender discrimination and retaliation.

55. Defendant knew its actions violated Title VII or it was recklessly indifferent in that regard.

56. Plaintiff was constructively discharged from her position as a Loan Assistant due to the fact that she complained about sexual harassment.

57. As a direct and proximate result of the foregoing, Plaintiff has suffered, and will continue to suffer, damages including, but not limited to, loss of front and back wages, earnings, benefits, insurance premiums, health care costs, diminution of future earning capacity, non-economic damages such as, but not limited to, mental anguish, inconvenience, attorney fees, costs and expenses, and other damages to be determined at trial. Plaintiff claims compensatory damages for these losses and injuries under § 102 of the Civil Rights Act of 1991, 42 U.S.C §1981a.

### SECOND CLAIM
#### (Retaliation in Violation of Title VII)

58. Plaintiff incorporates by reference the allegations set forth above in Paragraphs 1 through 56.

59. Defendant's conduct in subjecting Plaintiff to the above adverse employment actions is in violation of §704 of Title VII, 42 U.S.C §2000e-3(a).

60. The effect of these statutory violations was to deprive Plaintiff of rights and privileges enjoyed by persons who have not engaged in activities protected by Title VII.

61. These statutory violations were intentional.

62. These statutory violations were willful and wanton, and/or were done with malice or with reckless indifference to Plaintiff's federally protected rights.

63. As a result of the actions of Defendant, Plaintiff suffered damages.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in her favor and against Defendant, and award her damages for back pay, front pay and benefits, personal humiliation, severe emotional pain, inconvenience, mental anguish, future pecuniary loss and loss of enjoyment of life, punitive damages, liquidated damages, penalties, costs, interest and expert fees, attorneys fees, and such other and further relief as this Court deems proper.

**PLAINTIFF DEMANDS A TRIAL BY JURY**

Respectfully submitted this _22nd_ day of _August_, 2013.

ELWYN F. SCHAEFER, P.C.

Elwyn F. Schaefer
Sara A. Green
1801 Broadway, Suite 550
Denver, CO 80202
(303) 825-1961
Attorney for Plaintiff

Plaintiff's Address:
1243 W. 100th Place
Northglenn, Colorado 80260