```
 1            IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF COLORADO
 2

 3   Civil Action No. 13-CV-02259

 4   DEBORAH FRANK,

 5         Plaintiff,

 6   v.

 7   AMFIRST BANK, NATIONAL ASSOCIATION, a Nebraska
     corporation,
 8
           Defendant.
 9
     _____

10

11            DEPOSITION OF MARENA COSTELLO

12                   February 5, 2014

13   _____

14

15         PURSUANT TO NOTICE, the deposition of

16   MARENA COSTELLO was taken on behalf of the Plaintiff at

17   1899 Wynkoop Street, Suite 700, Denver, Colorado, on

18   February 5, 2014, at 3:01 p.m. before Karen Bucklin,

19   Registered Professional Reporter and Notary Public within

20   the state of Colorado.

21

22

23

24

25
```

EXHIBIT 5

```
 1  before you answer any questions.  Okay?
 2       A    Yes.  (Reviewed documents.)
 3            Okay.
 4       Q    Okay.  Is it fair to state that Ms. Frank is
 5  asking for some additional help to get her tasks done?
 6       A    Yes.
 7       Q    And it's fair to say that she's willing to
 8  skip lunch so that she can get her work done?
 9       A    Yes.
10       Q    Okay.  And this is February -- these are dated
11  February 24 and February 28, 2011; right?
12       A    Yes.
13       Q    And I think you told me before, but tell me
14  again.  Who is Brenda?
15       A    Brenda Spencer.
16       Q    And does she work in the Longmont office?
17       A    No.  She worked in the Greenwood Village
18  office.
19       Q    Okay.
20            (Exhibit 22 marked.)
21       A    (Reviewed documents.)
22       Q    (By Mr. Schaefer)  I'm going to ask you a very
23  simple and dumb question.
24            On the first page of Exhibit 22 at the very
25  bottom, there's an e-mail from Elly Leonida.  And there's
```

```
 1  no message there.
 2          Do you have any recollection as to what that
 3  message may have pertained to?
 4      A   I imagine it was the e-mail to this lady
 5  because Deb was having trouble getting access to the
 6  flood determination thing -- LERETA is our flood
 7  service --
 8      Q   Okay.
 9      A   -- and I believe that if there was a message
10  there, it was probably to tell me that they had gotten
11  her finally set up.
12          Because I think in the top part it says, "Here
13  is your new information. Try to access the website and
14  see if it works."
15      Q   So this has nothing to do with any alleged
16  inadequacies on behalf of Ms. Frank; is that correct?
17      A   Correct.
18          (Exhibit 23 marked.)
19      A   (Reviewed documents.)
20          Okay.
21      Q   (By Mr. Schaefer) Okay. This, in sum and
22  substance, is Ms. Frank saying, "I need more training,
23  I'm only one person and I'm trying my best, can I get
24  some training?"
25          Is that a fair summary?
```

1   A   That's what she's saying, yes.
2   Q   What did you do in response to this Exhibit 23
3   and her request for training?
4   A   She had -- I had gone over the ordering of
5   flood determinations with her when I was there using my
6   password.
7       And it's a simple like two-step process to go
8   online, bring it up, put the address in, and order it.
9       I had gone over that with her using mine and
10  then got her set up through this LERETA with her password
11  and stuff. They had a little problem for some reason
12  getting her set up.
13      But she did get the information to finally
14  access it. But I had given her the training using my
15  access prior to this.
16      The -- I think what she's asking for there is
17  training on the flood determination. Is that -- I think
18  that's what she's asking for there.
19  Q   Did you give her some additional training with
20  regard to the flood certificates or flood certification?
21  A   Like I just said, I did that prior to her even
22  getting her passwords.
23  Q   And I understand that. But my question is,
24  did you respond affirmatively in some fashion to this
25  e-mail dated March 1, 2011?

MARENA COSTELLO - February 5, 2014

14

1  A   Without checking my notes, I believe after I
2  got this, the next time I went to Longmont we went over
3  it again.
4      It's -- again, it's a really simple procedure
5  on how to do it. There's not a real -- it's not real
6  complicated. Once you have your access, I mean, it's
7  really simple.
8  Q   Well, not complicated to you but it may have
9  been complicated to Ms. Frank.
10 A   Well, I believe that there's another e-mail
11 that says when she finally went in and did it that it was
12 really easy.
13 Q   We may be getting to that shortly.
14     (Exhibit 24 marked.)
15 Q   (By Mr. Schaefer) What does this pertain to?
16 A   What we were just talking about. She asked
17 for help on March 1st.
18     I said on March 2nd, "I will need you" -- in
19 the morning, 6:42 a.m., I sent her an e-mail and said, "I
20 will need you available when I arrive to go over Title
21 work and Flood Cert. Shouldn't take to long. I know you
22 have training at 10 PM, but we should be done before
23 that."
24 Q   10:00 p.m.?
25 A   Oh, that should have been a.m. That's just a

```
 1   typing error.
 2       Q    Shouldn't take "to" long, t-o?
 3       A    I wrote it at 6:42 a.m. in the morning, wrote
 4   it pretty fast.
 5       Q    I understand.  Okay.
 6            (Exhibit 25 marked.)
 7       Q    (By Mr. Schaefer)  What is Exhibit 25,
 8   Ms. Costello?
 9       A    It's an e-mail dated March 9th  from me to
10   Deb.
11       Q    Okay.  "To many loans"?
12       A    I made a typing error.
13       Q    During this period of time, isn't it true that
14   Ms. Frank expressed her frustration a number of times
15   about her lack of training?
16       A    Yes.
17       Q    At one point did you call her into an empty
18   office and tell her to sit down and be quiet because you
19   had plenty to talk to her about?
20       A    I don't believe I would have ever spoken to
21   her that way.
22       Q    Did you tell her that she was not your peer
23   and you were the boss?
24       A    I don't believe I would have ever said that.
25       Q    Is it possible you did?
```

MARENA COSTELLO - February 5, 2014

16

1   A   I don't think so.
2   Q   Did you ever tell her that -- or excuse me.
3       Did she ever tell you that she didn't deserve
4   a memo like the one you had written -- I'll withdraw the
5   question.
6       Did you spend approximately 20 minutes with
7   her showing Ms. Frank two Web sites, the flood Web site
8   and the title policy Web site?
9   A   Yes.
10  Q   You talked about keeping notes with regard to
11  Ms. Frank's performance.
12      When did you start to take those notes?
13  A   When she came under my direct supervision in
14  November of 2010.
15  Q   Had you kept notes with regard to other
16  employees that you had supervised?
17  A   Yes.
18  Q   So this is a regular practice of yours?
19  A   Yes. It's the only way in a year's time when
20  I give an annual review that I can go back and remember
21  notes or comments that I might have wanted to include in
22  a review.
23  Q   Do you recall giving her a note on January 4,
24  2011, telling her that the situation between her and
25  Mr. Callis had been resolved?